**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 14-cv-0412-WJM-CBS

ORICA AUSTRALIA PTY LTD, an Australian proprietary limited company,

    Plaintiff,

v.

ASTON EVAPORATIVE SERVICES, LLC, a Colorado limited liability company,

    Defendant.

---

**ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

---

In this lawsuit, Plaintiff Orica Australia Pty. Ltd. ("Orica") sues Defendant Aston Evaporative Services, LLC ("Aston") to recover the amount Orica paid to purchase allegedly defective equipment from Aston. (ECF No. 1.) Currently before the Court is Aston's Motion for Summary Judgment. (ECF No. 66.) For the reasons explained below, Aston's motion is denied.

**I.  LEGAL STANDARD**

Summary judgment is warranted under Federal Rule of Civil Procedure 56 "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986). A fact is "material" if, under the relevant substantive law, it is essential to proper disposition of the claim. *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001). An issue is "genuine" if the evidence is such that it might lead a reasonable trier of fact to return a verdict for

the nonmoving party. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

In analyzing a motion for summary judgment, a court must view the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). In addition, the Court must resolve factual ambiguities against the moving party, thus favoring the right to a trial. *See Houston v. Nat'l Gen. Ins. Co.*, 817 F.2d 83, 85 (10th Cir. 1987).

## II.  FACTS

The following facts are undisputed unless otherwise noted.

### A.  General Background[1]

Orica is an Australian company that services the mining industry. (ECF No. 66 at 2.)[2] At some point in 2011 or early 2012, an opportunity arose for Orica to supply an Australian coal mine known as the Oaky Creek mine with technology that speeds up the process of evaporation, thus permitting Oaky Creek to rid itself of wastewater (or at least the water portion of wastewater) by sending it into the air. (*Id.*) Orica then began negotiating with Aston, a company based in Grand Junction, Colorado, that manufactures such evaporation technology. (*Id.*) Specifically, Orica and Aston began

---

[1] The narrative in this Part II.A does not derive from the parties' statements of material fact or summary judgment exhibits, but from general background information stated elsewhere in their filings. Nonetheless, it does not appear that these matters are in dispute, or at the very least, that any dispute is material to the outcome of this motion. The Court therefore includes this information to provide context for the subsequent narrative.

[2] All ECF page citations are to the page number in the ECF header, which does not always match the page number inserted by the filer's word processing program.

negotiating terms by which Orica would acquire an Aston Tempest 1600 SS316 evaporation unit ("Tempest 1600"), which Orica would then supply to Oaky Creek on a trial basis. (ECF No. 1 ¶¶ 8–9.)

**B.     The Contract for Unit 1**

On November 14, 2011, Aston e-mailed Orica a "terms sheet," proposing terms by which Aston would supply one Tempest 1600 to Orica. (ECF No. 66-2.) Apparently Orica proposed a different deal, because on March 13, 2012, Aston employee Kevin King e-mailed Orica employee Brendan Murray with a "counter" to some previous Orica offer that is not in the record. (ECF No. 71-6 at 3.) King's March 13 counteroffer addressed price, shipping, payment, certain warranty issues, and other specific terms relating to the sale of a Tempest 1600. (*Id.*)

On March 19, 2012, Murray responded by countering the counteroffer. (*Id.* at 2–3.) The next day, March 20, King replied, "Will agree to terms if unit ordered by March 30th, 2012!" (*Id.* at 2.) Orica did not order a Tempest 1600 by March 30, 2012. (ECF No. 74 at 3, ¶ 9.)

Discussions apparently continued, however. On May 10, 2012, Murray e-mailed King to inform King that Orica "will be ordering a [Tempest 1600] unit. Can you please go ahead and get this underway and try to fast-track this delivery ASAP[?] PO [*i.e.*, purchase order] from Orica will be sent to you tomorrow." (ECF No. 71-7 at 4–5 (line breaks omitted).) That same day, King replied, "Got it and will press as fast as possible!" (*Id.* at 4.)

The next day (Friday, May 11, 2012), Murray sent another e-mail stating that he was "having some trouble with the PO" and he would send it "on Monday morning," but "[y]ou have our commitment to purchase the unit as per our agreement below." (*Id.* at 3.)  The "agreement below" was his March 19 counter-counteroffer. (*Id.* at 3–4.)

On Tuesday, May 15, 2012, King responded to Murray as follows:

> We have the order in place on the [Tempest 1600] and it looks like they can expedite the delivery [in] just under 2 weeks. We have a skid ready but I have our programmer Tony checking on meeting AUS specs for all panel wiring. Let me know when you can push through the PO on your end?

(*Id.* at 3.)  Later that day, Murray responded that "an IT issue" was holding up the PO but another Orica employee (presumably senior to Murray) "can send[,] through email[,] confirmation of our commitment to proceed if this would assist.  Please advise how you would prefer to proceed.  The most important thing is we do not want to incur any delays as we need to meet our delivery dates." (*Id.* at 2.)  The record does not reveal whether King replied to this e-mail.  On May 21, 2012, however, Murray e-mailed King "the official PO" (*id.*), which the Court will refer to as the "Unit 1 Purchase Order."

The Unit 1 Purchase Order is, technically speaking, an eight-page document. (*Id.* at 7–14.)  Functionally, however, it is more like a four-page document, with customized terms on one face of each sheet and preprinted terms on the back face of each sheet.  As relevant here, the most important customized term was that Aston's Tempest 1600 unit would be designed to meet an Australian mining safety standard known as "MDG 41." (*Id.* at 13.)

As for the preprinted terms, the Purchase Order refers to them as the "Orica

4

Conditions of Purchase overleaf," and states that those Conditions "apply unless stated elsewhere on this order." (*Id.* at 7.) The Conditions of Purchase impose various warranties and arguably shift most of the risk relating to the product to the "Seller" (in this case, Aston). (*Id.* at 8.) At a later deposition, King (Aston's Rule 30(b)(6) designee) stated that he could not recall if Aston communicated any disagreement with the Conditions of Purchase to Orica (ECF No. 71-3 at 10), and there is no evidence in the record of any such communication.

On July 4, 2012, Aston invoiced Orica for the amount due under the Unit 1 Purchase Order. (ECF No. 71-10 at 2–3.)

**C.    The Contract for Units 2–4**

On July 18, 2012, Murray e-mailed King another purchase order, this one for three additional Tempest 1600s ("Units 2–4 Purchase Order"). (ECF No. 71-11 at 2–10.) For present purposes, the Units 2–4 Purchase Order is materially indistinguishable from the Unit 1 Purchase Order, including the standardized Conditions of Purchase and the customized requirement for MDG 41 compliance. (*Id.* at 3–4.) According to King, the Units 2–4 Purchase Order resulted from additional conversations with Orica employees:

> . . . that conversation, I think, was verbal, and when I was in Australia, you know, we need to get these next three coming. This first one has gone real well. We're ready for the next three. Let's get them coming. Let's get them expedited. And so there was some verbal there, and then the POs came through . . . .

(ECF No. 71-3 at 5.)

On July 20, 2012, Aston invoiced Orica for the amounts due under the Units 2–4

Purchase Order.  (ECF No. 71-10 at 4–6.)

**D.     Inspections & Deployment**

Before deployment at the Oaky Creek mine, Orica inspected Units 1–4.  (ECF No. 66 at 3, ¶¶ 4–5.)  Orica contends that it found numerous problems with all four units (including non-compliance with MDG 41), but it deployed all four units anyway subject to an agreement with Aston to continue attempting to work out the problems.  (ECF No. 71 at 4, ¶ 6.)  Unit 1 began operating at Oaky Creek in August or September 2012; the remaining units began operating in December 2012.  (ECF No. 66 at 4, ¶¶ 8–9.)

Oaky Creek rented all four units from Orica.  (*Id.* at 3–4, ¶¶ 7, 13.)  Orica claims that Oaky Creek intended to buy the units from Orica assuming they operated satisfactorily.  (ECF No. 86-1 at 3, ¶ 26.)

**E.     Operation & Eventual Rejection**

Through May 2013, Unit 1 operated for 2,228 hours; Unit 2 operated for 777 hours; Unit 3 operated for 1,608 hours; and Unit 4 operated for 488 hours.  (ECF No. 66 at 4, ¶ 10.)  On June 3, 2013, Orica sent a letter to Aston demanding a refund of the purchase price and that Aston pay to send all four units back to the United States.  (ECF No. 66-11 at 3–4.)  The letter claimed that all units had significant design defects, and that Aston had not been helpful in resolving those defects.  (*Id.*)  As the existence of this lawsuit demonstrates, Aston refused Orica's demand.  Aston denies Orica's claim that its units were defective and instead alleges that any problems were caused by Oaky Creek's failure to properly maintain the units.  (ECF No. 66 at 4, ¶ 14.)

## III.  ANALYSIS

### A.  UCC vs. CISG

The parties agree that the contract in dispute was a contract for the sale of goods. (ECF No. 71 at 5, ¶ 1.)  Normally, Article 2 of the UCC (Colo. Rev. Stat. §§ 4-2-101 to -725) would govern such a transaction.  But given the international character of the transaction, another body of law might govern instead: the United Nations Convention on Contracts for the International Sale of Good ("CISG").[3]

The CISG "applies to contracts of sale of goods between parties whose places of business are in different States * * * when the States are Contracting States."  CISG, art. (1)(a).  Here, Aston's place of business is in the United States and Orica's place of business is in Australia. (ECF No. 71 at 5, ¶¶ 2–3.)  Both Australia and the United States are CISG signatories.  *See* http://www.uncitral.org/uncitral/en/uncitral_texts/sale_goods/1980CISG_status.html (last visited July 22, 2015).  Thus, by its terms, the CISG appears to apply.

Although the CISG allows parties to opt out of its provisions, *see* CISG, art. 6, no party has presented this Court with any evidence or argument that they intended to opt out.[4]  Accordingly, the Court holds that the CISG, not the UCC, applies to this

---

[3] The CISG's complete text may be found at http://www.uncitral.org/pdf/english/texts/sales/cisg/V1056997-CISG-e-book.pdf.

[4] The Conditions of Purchase, which Orica believes to be a part of the parties' contract, contain a choice-of-law provision that could require application of Australian law. (ECF No. 71-7 at 8, § 20.)  However, Orica argues for application of the CISG, not Australian law. (ECF No. 71 at 11–12.)  In any event, a number of American courts have held that simply selecting a particular forum's laws is not enough to opt out of the CISG when the CISG is itself part of the laws of that forum.  *See, e.g.*, *Travelers Prop. Cas. Co. of Am. v. Saint-Gobain Technical Fabrics Canada Ltd.*, 474 F. Supp. 2d 1075, 1081–82 (D. Minn. 2007); *Asante Techs., Inc. v. PMC-Sierra, Inc.*, 164 F. Supp. 2d 1142, 1149–50 (N.D. Cal. 2001).

transaction.

**B.    When Was the Contract Formed for Unit 1?**

Aston asks this Court to hold as a matter of law that its contract with Orica for Unit 1 does not include the terms of the Unit 1 Purchase Order. (ECF No. 66 at 6–9.) This raises the question of precisely when the contract for Unit 1 formed.

The record shows that, in early 2012, there was:

- some sort of offer by Orica,

- a March 13 counteroffer by Aston,

- a March 19 counter-counteroffer by Orica, and

- a March 20 communication from Aston that is effectively a counter-counter-counteroffer, accepting Orica's March 19 terms but conditioning the deal on Orica placing an order by March 30, 2012.

(*See* Part II.B, *supra*.) Orica did not place such an order by March 30, 2012, so Aston's March 20 offer expired by its own terms. *Cf.* CISG, art. 18(2) ("An acceptance is not effective if the indication of assent does not reach the offeror within the time he has fixed . . . .").

Then, about six weeks later (May 10), Orica told Aston that it would be ordering a Tempest 1600, that a purchase order was on the way, and that it wanted Aston to "fast-track [the] delivery." (ECF No. 71-7 at 4–5.) King replied, "Got it and will press as fast as possible!" (*Id.* at 4.) No party argues that this exchange created a contract.

On May 11, Orica e-mailed Aston to announce its "commitment to purchase the unit as per our agreement below," referring to Orica's March 19 terms. (*See* ECF No.

71-6 at 2–3; ECF No. 71-7 at 3–4.) Orica said the purchase order would be forthcoming after the weekend. (ECF No. 71-7 at 3.)

Aston asks this Court to hold as a matter of law that Aston's contract with Orica for Unit 1 formed as of this May 11 e-mail, comprising the terms of the May 11 e-mail along with the "terms sheet" that opened the deal negotiations back in November 2011. (ECF No. 66 at 6–7.) Invoking language from UCC § 2-207 (Colo. Rev. Stat. § 4-2-207), Aston characterizes this as "an agreement [that] has been reached . . . by informal correspondence," and characterizes the Unit 1 Purchase Order (which came ten days later) as a "formal memorand[um] embodying the terms so far as agreed upon and adding terms not discussed," particularly the Conditions of Purchase on the back of each page. *See* Colo. Rev. Stat. § 4-2-207, official cmt. 1. Under § 2-207, such additional terms "become part of the contract unless * * * [t]hey materially alter it." *Id.* § 4-2-207(2)(b). Aston, of course, contends that the Conditions of Purchase materially altered the deal, and therefore argues that the Conditions of Purchase did not become part of the contract. (ECF No. 66 at 7–9.)

Orica responds (correctly) that the CISG, not the UCC, governs the transaction. (ECF No. 71 at 11–12.) Orica then invokes article 19 of the CISG, which differs markedly from UCC § 2-207. Whereas § 2-207 might dictate that the parties indeed formed a contract but *without* the Conditions of Purchase (assuming they are material alterations), article 19 of the CISG treats the presence of materially different terms as a *rejection* and *counteroffer*: "A reply to an offer which purports to be an acceptance but contains additions, limitations or other modifications is a rejection of the offer and constitutes a counter-offer." CISG, art. 19(1). Under this scenario, says Orica, Aston

accepted the counteroffer (*i.e.*, the Unit 1 Purchase Order) by performing (*i.e.*, subsequently invoicing, accepting payment, and supplying Unit 1). (ECF No. 71 at 12–13.) *See also* CISG, art. 18(3) (treating performance as a means of manifesting acceptance). Although Orica asserts this argument, it has not cross-moved for summary judgment and therefore has not asked this Court to endorse the argument as a matter of law. It asserts it only to defeat Aston's argument for judgment as a matter of law.

The Court agrees that it cannot hold in Aston's favor as a matter of law. Aston's position hinges on characterizing Orica's May 11 e-mail and preceding correspondence as "an agreement [that] has been reached . . . by informal correspondence." Colo. Rev. Stat. § 4-2-207, official cmt. 1. But the May 11 e-mail was a resurrection of specific terms first urged by Orica in its March 19 e-mail, on which the parties had agreed subject to placement of an order by March 30. Because Orica placed no such order, its re-urging of the March 19 terms on May 11 created a *new offer*.

To the extent Aston intends to characterize the May 11 e-mail as Orica's acceptance of Aston's March 20 offer (*see* ECF No. 74 at 3, ¶ 9), such acceptance would obviously be long after the March 30 deadline. The CISG permits an offeror such as Aston to ratify a late acceptance only "if without delay the offeror orally so informs the offeree [Orica] or dispatches a notice to that effect." CISG, art. 21(1). Aston does not cite this standard and does not point the Court to any evidence that might otherwise fulfill it.

The record *does* contain Aston's May 15 e-mail response: "We have the order in place on the [Tempest 1600] and it looks like they can expedite the delivery [in] just

under 2 weeks. . . . Let me know when you can push through the PO on your end?" (ECF No. 71-7 at 3.) But Aston does not argue that this e-mail fulfills the CISG requirement for ratifying a late acceptance. Moreover, commentary on the relevant requirement suggests that the offeror's ratification must make clear that the offeror is accepting an offer that had already expired. See John O. Honnold, *Uniform Law for International Sales under the 1980 United Nations Convention* § 174 (3rd ed. 1999) (discussing an example in which the offeror stated, "Your June 29 letter was mailed too late to reach me by the June 30 limit set in my offer but I am treating it as an acceptance."), *reprinted at* http://www.cisg.law.pace.edu/cisg/biblio/ho21.html (last visited July 23, 2015). Thus, the Court cannot hold as a matter of law that Orica's May 11 e-mail constituted an acceptance of any offer from Aston.

Nonetheless, Aston's May 15 e-mail *might* qualify as an acceptance of the offer made in Orica's May 11 e-mail, thus creating a contract as of May 15. *Cf.* CISG, art. 23 ("A contract is concluded at the moment when an acceptance of an offer becomes effective in accordance with the provisions of this Convention."). And if a contract existed as of May 15, then the Unit 1 Purchase Order (transmitted over a week later) would not be "[a] reply to an offer which purports to be an acceptance but contains additions, limitations or other modifications." CISG, art. 19(1). The Unit 1 Purchase Order would instead be a proposal to amend the already-formed contract, taking it outside of article 19. *See, e.g.*, *VLM Food Trading Int'l, Inc. v. Ill. Trading Co.*, 748 F.3d 780, 786 (7th Cir. 2014); *Chateau des Charmes Wines Ltd. v. Sabate USA Inc.*, 328 F.3d 528, 531 (9th Cir. 2003); *Solae, LLC v. Hershey Canada, Inc.*, 557 F. Supp. 2d

452, 457 (D. Del. 2008). For several reasons, however, the Court cannot at this time hold as a matter of law that Aston's May 15 e-mail was in fact an acceptance sufficient to form a contract.

First, neither Aston nor Orica addresses the potential effect of the May 15 e-mail. Thus, the Court cannot be certain the parties have placed into the record all the evidence they feel is necessary to understand the May 15 e-mail in context.

Second, the e-mail is ambiguous in a number of ways. Consider the first sentence: "We have the order in place on the [Tempest 1600] and it looks like they can expedite the delivery [in] just under 2 weeks." Does "we have the order in place" mean that Aston had logged the order in its own system specifically in response to Orica's May 11 offer? This would suggest acceptance. Or, does it mean that Aston already had an order in place (*e.g.*, in anticipation of an expected offer)? This might suggest acceptance, or simply Aston's belief since before May 11 that a deal with Orica was imminent.

The May 15 e-mail's last sentence also creates an ambiguity: "Let me know when you can push through the PO on your end?" This sentence prompted the following exchange at King's deposition:

> Q. So you're asking Brendan Murray for a purchase order?
>
> A. Correct.
>
> Q. Why?
>
> A. Well, that kind of consummates the deal.

(ECF No. 71-3 at 7.) Orica also points to Aston's interrogatory responses, verified by King, in which Aston stated that the agreement to sell Unit 1 was "reached on May 21,

12

2012," the same day that Orica transmitted the Unit 1 Purchase Order. (ECF No. 71-1 at 3.) Orica interprets all of this to mean that Aston itself considered the Unit 1 Purchase Order to be the "acceptance." (ECF No. 71 at 12–13.)

A reasonable jury could adopt Orica's interpretation of the evidence, but reasonable jury could also conclude that Aston's May 15 e-mail closed the deal. This is a question of subjective intent and the parties' interpretations of their own and the other side's communications, which the CISG places in the realm of fact. *See* CISG, art. 8(3) ("In determining the intent of a party or the understanding a reasonable person would have had, due consideration is to be given to all relevant circumstances of the case including the negotiations, any practices which the parties have established between themselves, usages and any subsequent conduct of the parties."); *id.*, art. 11 ("A contract of sale . . . may be proved by any means, including witnesses."); *see also MCC-Marble Ceramic Ctr., Inc. v. Ceramica Nuova D'Agostino, S.P.A.*, 144 F.3d 1384, 1387 (11th Cir. 1998) ("The plain language of the [CISG], therefore, requires an inquiry into a party's subjective intent as long as the other party to the contract was aware of that intent."). Accordingly, a genuine dispute of material fact exists over the point at which the parties believed the contract was formed, and summary judgment for Aston must be denied on this point.

**C.   When Was the Contract Formed for Units 2–4?**

Although Aston admits that Orica's May 11 e-mail only addressed Unit 1 (ECF No. 74 at 3, ¶ 16), Aston applies its foregoing argument indiscriminately to Units 1–4. (*See* ECF No. 66 at 6.) Considering that Units 2–4 came by way of later discussions

13

and a later purchase order (*see* Part II.C, *supra*), this position potentially fails as a matter of law. But Orica has not moved for such relief and this Court may not grant it without notice and an opportunity to respond. See Fed. R. Civ. P. 56(f). At the very least, a genuine dispute of material fact prevents summary judgment in Aston's favor regarding Units 2–4.

**D.    Did Orica Timely Revoke Acceptance?**

As noted above, Orica demanded a refund and return in June 2013. (*See* Part II.E, *supra*.) Aston claims that this demand was ineffective for at least three reasons: (1) Orica knew before accepting the units that they did not comply with MDG 41, and so waived any objection on that account; (2) Orica's revocation was unreasonably tardy; and (3) Orica forfeited its opportunity to revoke because the units' condition had materially deteriorated in the meantime. (ECF No. 66 at 10–14.) The Court will address each contention in turn.

    1.    MDG 41

The CISG states that a seller is not liable for a product's failure to conform to expectations "if, at the time of the conclusion of the contract, the buyer knew or could not have been unaware of such lack of conformity." CISG, art. 35(3). This provision does not conform precisely to the situation presented here because both parties agree that "the conclusion of the contract" was sometime in May 2012 and the inspection (which supposedly revealed lack of MDG 41 compliance) took place later. Nonetheless, the Court is comfortable presuming that the same principle applies. Thus, Aston may validly claim that Orica waived any objection based on MDG 41 compliance

if Orica discovered lack of compliance before accepting the units but accepted them anyway.

Nonetheless, a material dispute of fact prevents summary judgment. Orica claims, based on competent evidence, that it and Aston agreed to continue to work on the units, hopefully to resolve their deficiencies, after deployment. (ECF No. 71 at 4, ¶ 6.) In addition, Orica claims that "[m]any of the ways in which the evaporation units were non-compliant with MDG 41 were not discovered until after [the inspection]." (*Id.* at 8, ¶ 21.) Assuming a jury believes Orica's story, it could conclude that Orica did not waive its MDG 41 compliance objection. *See, e.g.*, CISG, art. 36(1) ("The seller is liable in accordance with the contract and this Convention for any lack of conformity which exists at the time when the risk passes to the buyer, even though the lack of conformity becomes apparent only after that time."). Consequently, summary judgment is not appropriate on this issue.

2. <u>Timeliness of Orica's Revocation</u>

According to the CISG, "The buyer loses the right to rely on a lack of conformity of the goods if he does not give notice to the seller specifying the nature of the lack of conformity within a reasonable time after he has discovered it or ought to have discovered it." CISG, art. 39(1). Aston has presented evidence from which a jury could conclude that Orica failed this standard. Orica received the Tempest 1600 units between August and December 2012, and, through May 2013, operated them for between approximately 500 to 2,200 hours. Orica did not demand a refund until June 2013. (*See* Parts II.D–E, *supra*.)

But, again, Orica has presented countervailing evidence, *i.e.*, that it and Aston

15

attempted for several months to solve the various problems cooperatively. (ECF No. 71 at 4, ¶ 6.) In these circumstances, it is for a jury to decide whether Orica revoked its acceptance within a reasonable time. *See*, *e.g.*, *CMI Corp. v. Leemar Steel Co.*, 733 F.2d 1410, 1415 (10th Cir. 1984) ("The question of whether a buyer's revocation of an acceptance is timely is, as with rejections, a question of fact.").[5]

### 3. Deterioration

Under the CISG, "[t]he buyer loses the right to declare the contract avoided . . . if it is impossible for him to make restitution of the goods substantially in the condition in which he received them," unless "the impossibility of making restitution of the goods or of making restitution of the goods substantially in the condition in which the buyer received them is not due to his act or omission." CISG, art. 82(1), (2)(a). This presents another material dispute of fact. Aston claims that the Tempest 1600 units deteriorated due to Oaky Creek's lack of maintenance. (ECF No. 66 at 13.) Orica claims that any damage to the units came through their own defective design, not through any lack of maintenance by Oaky Creek. (ECF No. 71 at 20.) A jury must decide which position to believe. Summary judgment is therefore inappropriate.

### E. May Orica Seek Lost Profits Damages?

Finally, Aston asks for summary judgment on Orica's claim for lost profits damages of roughly $500,000, allegedly attributable to Orica's inability to sell the units

---

[5] The *CMI* case interprets the UCC, not the CISG. However, "[c]aselaw interpreting analogous provisions of Article 2 of the [UCC], may also inform a court where the language of the relevant CISG provisions tracks that of the UCC." *Delchi Carrier SpA v. Rotorex Corp.*, 71 F.3d 1024, 1028 (2d Cir. 1995). CISG, art. 39(1)'s timeliness requirement is analogous to UCC § 2-608. *See* Colo. Rev. Stat. § 4-2-608(2) ("Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it . . . .").

to Oaky Creek.  (ECF No. 66 at 14.)  Aston largely relies on cases applying Colorado common law, which require "(1) proof of the fact that damages will accrue in the future, and (2) sufficient admissible evidence which would enable the trier of fact to compute a fair approximation of the loss."  *Pomeranz v. McDonald's Corp.*, 843 P.2d 1378, 1382 (Colo. 1993).  Aston contends that it is "complete speculation and conjecture on Orica's part" whether it would have sold any of the units to Oaky Creek, and Orica's claim for future damages fails as a matter of law.  (ECF No. 66 at 15.)

Here, the CISG, not Colorado common law, will govern damages.  Whether that is a distinction with a difference is unclear.  The CISG permits damages "equal to the loss, including loss of profit, suffered by the other party as a consequence of the breach."  CISG, art. 74.  Courts applying this have often imported lost-profits standards similar to Colorado's.  *See, e.g.*, *Delchi Carrier*, 71 F.3d at 1029; *Topp Paper Co., LLC v. ETI Converting Equip.*, 2013 WL 5446341, at *7 (S.D. Fla. Sept. 28, 2013); *TeeVee Toons, Inc. v. Gerhard Schubert GmbH*, 2006 WL 2463537, at *9 (S.D.N.Y. Aug. 23, 2006).  Moreover, Orica does not explicitly argue for a different standard, but instead focuses on showing that it has evidence to satisfy the Colorado standard.  (ECF No. 71 at 21–24.)  Accordingly, the Court will assume that the Colorado lost-profits requirements apply equally well in the CISG context.  Thus, Orica must have enough evidence to go to a jury on the fact of lost profits and a reasonable method for calculating such lost profits.  *Pomeranz*, 843 P.2d at 1382.

Concerning the fact of lost profits, Orica has submitted testimony from an Oaky Creek representative stating that Oaky Creek generally intended to buy the Tempest 1600 units leased from Orica, assuming those units performed well.  (ECF No. 86-1 at

3, ¶ 26.)  Thus, the possibility of future profits is not mere speculation.

As for a method of calculating lost profits, Orica has submitted testimony from Murray that it had already agreed with Oaky Creek on a purchase price, subject to a successful trial.  (ECF No. 71 at 10, ¶ 30.)  Assuming a jury believes that testimony, the Court finds it would be adequate to calculate lost profits with sufficient certainty.  Thus, summary judgment for Aston on the lost-profits question is inappropriate.

### IV.  CONCLUSION

For the reasons set forth above, Aston's Motion for Summary Judgment (ECF No. 66) is DENIED.

Dated this 28th day of July, 2015.

BY THE COURT:

_____
William J. Martinez
United States District Judge