**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge William J. Martínez**

Civil Action No. 14-cv-0412-WJM-CBS

ORICA AUSTRALIA PTY LTD, an Australian proprietary limited company,

Plaintiff,

v.

ASTON EVAPORATIVE SERVICES, LLC, a Colorado limited liability company,

Defendant/Third Party Plaintiff,

v.

UE MANUFACTURING, LLC, a Colorado limited liability company,

Third Party Defendant/Counterclaimant.

---

**ORDER GRANTING IN PART AND DENYING IN PART THIRD PARTY DEFENDANT UE MANUFACTURING, LLC'S MOTION FOR SUMMARY JUDGMENT**

---

In this lawsuit, Plaintiff Orica Australia Pty. Ltd. ("Orica") sues Defendant Aston Evaporative Services, LLC ("Aston") to recover the amounts Orica paid Aston to purchase allegedly defective wastewater evaporation devices. (ECF No. 1.) Aston has in turn sued Third Party Defendant UE Manufacturing, LLC ("UEM"), to which Aston subcontracted some of the work on the allegedly defective devices. (ECF No. 14.)

Currently before the Court is UEM's Motion for Summary Judgment ("Motion"). (ECF No. 72.) For the reasons explained below, the Motion is granted with respect to any consequential damages Orica might recover on account of certain alleged technical deficiencies, but otherwise denied.

## I. LEGAL STANDARD

Summary judgment is warranted under Federal Rule of Civil Procedure 56 "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986). A fact is "material" if, under the relevant substantive law, it is essential to proper disposition of the claim. *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001). An issue is "genuine" if the evidence is such that it might lead a reasonable trier of fact to return a verdict for the nonmoving party. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

In analyzing a motion for summary judgment, a court must view the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). In addition, the Court must resolve factual ambiguities against the moving party, thus favoring the right to a trial. *See Houston v. Nat'l Gen. Ins. Co.*, 817 F.2d 83, 85 (10th Cir. 1987).

## II. FACTS

The following facts are undisputed unless otherwise noted.

### A. The Tempest 1600

This case involves technology designed to accelerate the evaporation of wastewater from collection ponds at places such as mines. (ECF No. 72 at 2.) Aston builds and sells such water evaporation technology. (*Id.* at 4, ¶ 3.) The Aston device

relevant to this case is known as the Tempest 1600 SS316 ("Tempest 1600"). (ECF No. 92 at 2–3.) The Tempest 1600 essentially comprises a power source on the bank of a wastewater pond connected to fans mounted on a structure that floats on the pond. (ECF No. 72 at 2.) The fans suck up wastewater and blow it into the air. (*Id.*)

**B. Aston's Agreement with UEM**

In or around May 2012, Aston agreed to supply Orica with one Tempest 1600 ("Unit 1"), which Orica would in turn lease to an Australian coal mine known as Oaky Creek. (ECF No. 92 at 2–5, 8–13.) Then, in or around July 2012, Aston agreed to supply Orica with three additional Tempest 1600s ("Units 2–4"), which were also intended for Oaky Creek. (*Id.* at 5–6, 13–14.) Aston subcontracted the assembly of Units 2–4 to UEM. (ECF No. 72 at 2.)

The terms of Aston's agreement with UEM are not clear. UEM claims that a contract was formed through what it calls the "Letter Proposal." (*Id.* at 3–4, ¶¶ 2, 4–5.) The Letter Proposal is a January 30, 2012 letter from one of UEM's sales managers to Aston employee Kevin King ("King"). (ECF No. 72-9.) The letter begins, "[UEM] recognizes and appreciates Aston's desire to purchase the products listed below. We would like to submit to you the following budgetary costs pending a full design review with Engineering." (*Id.* at 1.) The letter then goes on to provide quotes for various items that might relate to Tempest 1600 units, but have no clear connection to the three units that UEM eventually built. For example, the Letter Proposal contemplates UEM building four units, not three, and all four have differing specifications for horsepower and number of fans. (*Id.*)

Aston denies that the Letter Proposal embodies the parties' contract and further claims that UEM submitted a "completely different quote" sometime later. (ECF No. 78-1 at 4; ECF No. 78 at 2–3, ¶¶ 4–5.) But Aston does not say whether that quote then became the parties' contract, nor does Aston submit any document that it claims to be the parties' contract.

**C.     UEM's Performance**

The parties' briefs do not specify precisely when UEM began building Units 2–4. The parties agree, however, that Units 2–4 underwent factory acceptance testing in September 2012. (ECF No. 72 at 6, ¶ 14.) Orica and Aston representatives attended this testing, accepted the Units, and Orica arranged for them to be shipped to Australia. (*Id.* at 7, ¶ 19.)

**D.     Problems with the Units**

King was in Australia when the Units arrived and inspected them during their unpacking. (*Id.* ¶ 22; ECF No. 72-8 at 4.) At his deposition, King testified that he noticed that none of the "power packs . . . were clean," that a "hose drum was about halfway full of hydraulic oil," and that "there was even a broken fitting on one of the hoses." (*Id.*) But these problems "were not such that Mr. King was able to determine that [Units 2–4] would not operate properly after set up and commissioning." (ECF No. 78 at 5, ¶ 22.)

Units 2–4 began operating at the Oaky Creek mine in December 2012. (ECF No. 92 at 6.) In the next few months, Units 2–4 experienced numerous problems which Orica and/or Oaky Creek attempted to repair. (ECF No. 72 at 8, ¶ 27.) Aston claims it

had various e-mail and telephone communications with UEM regarding these problems. (ECF No. 78 at 6, ¶ 30; ECF No. 78-1 at 8.) The first e-mail in the record, however, is a March 14, 2013 communication from King to Aston employee Chris Schuette, which begins as follows:

> Chris,
>
> It's been a while since we spoke but we have tried to make the units that UE completed trouble and leak free and have spent lots of time and money on repairs but [are] still having leaks mainly from failed pipe fittings and the dope used on these that failed immediately upon commissioning the units.
>
> I have traveled 3 times to Australia and most of the repairs have been leaks on pipe fittings used in the build process. Please call me ASAP to discuss solutions and moving forward so that everyone's best interests [are] preserved!

(ECF No. 72-15 at 1.) UEM views this e-mail as Aston's attempt to revoke its previous acceptance (in September 2012) of Units 2–4. (*See* ECF No. 72 at 14.)

## III. ANALYSIS

### A. Timely Revocation of Acceptance

As the parties frame it, this matter turns on acceptance of goods, and alleged revocation of acceptance, under Article 2 of the Uniform Commercial Code ("UCC"). *See* Colo. Rev. Stat. §§ 4-2-101 to -725.[1] Aston admits that, for UCC purposes, it accepted Units 2–4 "at the time the units were turned over to Orica." (ECF No. 78 at 9.) That was sometime in September 2012. (ECF No. 72 at 6–7, ¶¶ 14, 18–19.) Thus,

---

[1] It is not clear that Aston's claims against UEM stand or fall on the timeliness of Aston's revocation. *See* Colo. Rev. Stat. § 4-2-714(2) & official cmt. 1 (discussing remedies for breach of warranty "after the goods have been accepted and the time for revocation of acceptance has gone by"). Nonetheless, this section analyzes the viability of Aston's claims to the extent they turn on timely revocation.

Aston accepted Units 2–4 in September 2012.

Given this, UEM argues that Aston's revocation was unreasonably late because it was supposedly expressed for the first time in the March 14, 2013 e-mail discussed at Part II.D, above. (*Id.* at 13–15.) Aston responds by invoking the UCC doctrine that "[t]he buyer may revoke his acceptance of a lot or commercial unit whose nonconformity substantially impairs its value to him if he has accepted it * * * [w]ithout discovery of such nonconformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances." Colo. Rev. Stat. § 4-2-608(1)(b).[2] Aston further notes that "[r]evocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it," *id.* § 4-2-608(2), and that "[w]hether a time for taking an action . . . is reasonable depends on the nature, purpose, and circumstances of the action," *id.* § 4-1-205(a).

Under these standards, Aston argues that there is at least a question of fact regarding whether it revoked within a reasonable time. Aston first asserts that discovery of the alleged defects was particularly difficult because King (who was Aston's main point of contact with Orica) was in Australia when Units 2–4 were placed into service but returned to the United States shortly thereafter and thus "was not in a position to personally observe the operation of the units, and to make any determinations as to any issues that arose, including defects." (ECF No. 78 at 10.) Apparently anticipating such an argument, UEM's Motion points out that King noticed

---

[2] The UCC also permits revocation where the buyer has accepted goods "[o]n the reasonable assumption that [their] nonconformity would be cured and it has not been seasonably cured." *Id.* § 4-2-608(1)(a). Aston, however, does not argue that this exception applies. (*See* ECF No. 78 at 9–10.)

problems with Units 2–4 "immediately" upon unpacking them from their shipping containers. (ECF No. 72 at 14.) But as noted in Part II.D, above, it is undisputed that whatever King noticed was not sufficiently problematic to put Aston on notice that Units 2–4 may have UEM-attributable fatal defects. Thus, on the current record, the fact that King noticed certain problems during the unpacking process is not enough to trigger Aston's duty of timely revocation.

Aston further asserts that "the difficulties in determining what defects were present in [U]nits 2–4 were also compounded . . . by the problems arising from" what Aston alleges to be a "severe lack of maintenance performed on the units by Orica and Oaky Creek." (*Id.*) UEM does not respond to this argument.

Finally, Aston asserts that, even before the March 14, 2013 e-mail, King (a) would forward to UEM personnel the Orica e-mails he received regarding problems with Units 2–4, and (b) had telephone conversations about these problems with UEM employee Ronnie Stover. (ECF No. 78 at 10–11; *see also* ECF No. 78-1 at 8.) To this, UEM responds that Aston has never produced any such e-mails and has not met any of the Federal Rule of Evidence 1004 criteria for testifying as to their content; and King's testimony about the telephone conversations is a "self-serving, bald assertion[]" that "amounts to nothing more than his own faded recollection." (ECF No. 79 at 4.)

As to the purported e-mails, the Court agrees with UEM that Federal Rule of Evidence 1004 governs the admissibility of King's testimony:

> An original is not required and other evidence of the content of a writing, recording, or photograph is admissible if:
>
> (a) all the originals are lost or destroyed, and not by the proponent acting in bad faith;

>    (b) an original cannot be obtained by any available judicial process;
>
>    (c) the party against whom the original would be offered had control of the original; was at that time put on notice, by pleadings or otherwise, that the original would be a subject of proof at the trial or hearing; and fails to produce it at the trial or hearing; or
>
>    (d) the writing, recording, or photograph is not closely related to a controlling issue.

Aston has not shown any awareness of, much less attempted to satisfy, any of these criteria. The Court therefore agrees with UEM that King's testimony about the purported e-mails "cannot be presented in a form that would be admissible in evidence," Fed. R. Civ. P. 56(c)(2), and therefore cannot create a genuine dispute of fact.

However, UEM has failed to establish that King's "self-serving . . . faded recollection" about phone conversations with Stover is inadmissible. "Self-serving" is not a recognized evidentiary objection (most party testimony is self-serving), and an allegedly "faded recollection" is a matter for cross-examination. Thus, King's testimony in this regard may be admitted at least for the purpose of proving that telephone conversations with Stover occurred. Moreover, given the lack of a hearsay or similar objection from UEM, the Court finds for purposes of summary judgment that King's testimony may be admitted to prove that his telephone calls with Stover addressed the problems Orica was having with Units 2–4.

Considering all of the foregoing, the Court agrees with Aston that a genuine dispute of fact exists regarding whether its March 14, 2013 e-mail constituted a revocation within a reasonable time. Summary judgment on this issue must therefore

be denied.[3]

**B. Consequential Damages**

1. Availability in General

UEM further argues that Aston, as a matter of law, may not recover consequential damages from UEM. (ECF No. 72 at 15–18.) The parties' arguments, however, display some confusion (or at least imprecision) regarding precisely what the "consequential damages" might be. UEM assumes that the consequential damages Aston seeks against UEM are the same consequential damages that Orica seeks against Aston, "particularly [Orica's] alleged lost profits." (ECF No. 72 at 17.) Orica claims it lost the profits it would have earned by eventually selling the Tempest 1600 units to Oaky Creek. (*See* ECF No. 92 at 17–18.)

Aston admits that it seeks to hold UEM liable for "any amount for which Aston is held liable to Orica [based on Units 2–4]," but distinguishes this claim from its claim for consequential damages, which instead comprises "attorneys' fees and expenses incurred in defending Orica's claims against Aston with regard to [Units 2–4], as well as the costs and expenses incurred by Aston as a result of its efforts to repair [Units 2–4]."

---

[3] In its Reply brief, UEM asserts for the first time: (i) the March 14, 2013 e-mail cannot be considered an effective revocation because it simply solicits help rather than expressing an intent to revoke and offering to return the units in exchange for a refund; and (ii) revocation of acceptance is considered an affirmative defense, but Aston never pleaded it as an affirmative defense to UEM's counterclaim for the alleged balance owing on Units 2–4. (ECF No. 79 at 3–8.) A party may not raise, and the Court will not consider, truly new arguments asserted in a reply brief. *Starkey ex rel. A.B. v. Boulder Cnty. Soc. Servs.*, 569 F.3d 1244, 1259 (10th Cir. 2009). These Reply arguments are truly new. They are quite different from UEM's Motion, which argued *only* that the March 14, 2013 e-mail was unreasonably late. (*See* ECF No. 72 at 13–15; *see also id.* at 3 ("UEM seeks summary judgment . . . on the basis of acceptance and untimely rejection.").) Thus, the Court will not consider, and expresses no opinion on, these arguments.

(ECF No. 78 at 7; *see also id.* at 12.)[4]

Aston's intent to hold UEM liable for whatever damages it must pay to Orica appears to be a claim for indemnity. Aston has not pleaded a specific cause of action for indemnity, but it has pleaded various causes of action for breach of warranty. (*See* ECF No. 14 ¶¶ 22–42.) The Colorado Supreme Court has suggested that breach of warranty is an appropriate method for a reseller to seek indemnity from the manufacturer. *See Webb v. Dessert Seed Co.*, 718 P.2d 1057, 1065 (Colo. 1986).

It does not necessarily follow, however, that Aston can hold UEM liable for Orica's lost profits, if any, through an indemnity or breach of warranty claim.[5] The problem with such a theory of recovery lies in the foreseeability standard for lost profits. This Court previously held that the United Nations Convention for the International Sale of Goods ("CISG") governs Orica's contract with Aston. (ECF No. 92 at 7–8.) This Court further held that article 74 of the CISG permits such damages under the same standard that Colorado imposes for proving lost profits damages. (*Id.* at 17.) Colorado's standard requires, among other things, that the plaintiff's potential to lose business on account of a breach must be reasonably foreseeable to the defendant at the time of contracting. *See Denny Const., Inc. v. City & Cnty. of Denver ex rel. Bd. of Water Comm'rs*, 199 P.3d 742, 750–51 (Colo. 2009). Thus, for Orica to recover lost

---

[4] These categories of damages (fees and expenses spent against Orica, repair expenses) are not directly at issue in UEM's Motion. As the parties prepare for trial, however, the Court encourages them to consider whether these are truly "consequential damages," or are instead direct damages (*see* Colo. Rev. Stat. § 4-2-711(1)), incidental damages (*see id.* § 4-2-715(1)), or amounts recoverable through the "wrong of another" doctrine (*see* Colo. Jury Instr., Civil 5:7 (4th ed.)).

[5] Aston concedes that it is not seeking its own lost profits. (*Id.* at 12 n.1.)

profits against Aston, it must show that Aston knew or should have known about Orica's plans to resell the Tempest 1600 units to Oaky Creek.

Assuming Orica can make that showing and the other showings required for consequential damages (*see* ECF No. 92 at 17–18 (discussing additional requirements)), it would be incongruous if Aston could turn around and, in the guise of indemnity, stick UEM with the entire bill absent a showing that UEM likewise understood at the time of its contract with Aston that Orica would lose the chance to sell Units 2–4 to Oaky Creek if those units did not perform as promised. Indeed, the foreseeability necessary to hold UEM liable may be even more specific than that. To the extent Aston required UEM to use certain parts or to follow certain designs, the question would be whether UEM reasonably foresaw at the time of contracting that Orica could lose Oaky Creek's business if Units 2–4 failed on account of parts supplied or designs created at UEM's discretion, or on account of UEM's workmanship in assembling the entire apparatus.

The UCC states that "[c]onsequential damages resulting from the seller's breach include * * * [a]ny loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know." Colo. Rev. Stat. § 4-2-715(2)(a). Thus, even though Aston may be asserting Orica's lost profits as a form of indemnity damages against UEM, the Court holds that the Aston must nonetheless prove the foreseeability of Orica's lost profits from UEM's perspective.

In this regard, Aston argues that, "[a]t or around the time UEM entered into its agreement with Aston to build [U]nits 2–4, UEM was aware that the units were being provided to Orica, who would in turn provide the units for use at the Oaky Creek Mine."

(ECF No. 78 at 7, ¶ 3.)  In support, Aston offers one item of evidence, specifically, an eight-page e-mail chain from July and August 2012.  (ECF No. 78-4.)  The e-mail chain begins with various Orica and Aston personnel discussing technical questions related to the Tempest 1600, and eventually moving on to a discussion of testing and deployment timelines.  (*Id.* at 3–8.)  Finally, on August 21, 2012, King forwards the e-mail chain to UEM personnel, asking, "How we looking time wise???"  (*Id.* at 2.)  The e-mail chain then continues between Aston (King), UEM, and Orica regarding assembly progress and scheduling for factory acceptance testing.  (*Id.* at 1–2.)

The only portions of this e-mail chain that mention Oaky Creek are a reference to building Units 2–4 "for Xstrata" (Oaky Creek's former name) and a discussion of "shipping to the mine site."  (*Id.* at 3, 4.)  These references come in the portion of the chain that preceded King's forward to UEM on August 21, 2012.  UEM, however, does *not* argue that the e-mail chain was insufficient to put it on notice of Orica's hope of selling the Tempest 1600s to Oaky Creek.  Moreover, UEM does not deny that at some point it became aware of Orica's intentions with respect to Oaky Creek.  UEM instead emphasizes the requirement that foreseeability be judged at the time of contracting.  (*See* ECF No. 79 at 6.)  UEM argues that the time of contracting was "months before" (apparently referring to the January 2012 Letter Proposal), and so the July/August 2012 e-mail chain does not suffice to show awareness at the time of contracting.  (*Id.*)

As noted at Part II.B, above, Aston denies that the Letter Proposal constitutes the parties' contract.  Aston's denial is supported by: (1) the text of the Letter Proposal itself, which does not seem to match what the parties eventually agreed to  (*see* ECF

No. 72-9); (2) King's testimony that UEM later provided a different quote (*see* ECF No. 78-1 at 4); and (3) the fact that Aston's contract with Orica to supply Units 2–4 did not come into existence until July 2012 (*see* ECF No. 92 at 5–6). Thus, there is a genuine dispute of fact regarding precisely what "the time of contracting" was for Aston and UEM. The Court accordingly cannot grant summary judgment to UEM on its claim that it was unaware of Orica's intentions at the relevant time.

2. Effect of Specific Tempest 1600 Components

UEM argues that consequential damages are unavailable for a separate reason, namely, that "the alleged substandard fittings and hoses installed by UEM [were] not the proximate cause for the 'complete failure' of the units." (ECF No. 72 at 17.) In support, UEM cites testimony from King's deposition where he generally agreed with a conclusion in UEM's expert report that certain components would not have caused the demise of Units 2–4:

> Q. I want to read to you a sentence and see if you can agree or disagree with me. . . .
>
> In [the expert's] report he states that the choice of fittings, open paren, multi-screw, versus welded joint, close paren, used in the primary intake to the hydraulic pumps, and the choice of hose in the case drain lines, would not have directly contributed to the units not being functional. However, they would have contributed toward earlier than inspected[6] liability and level of maintenance repair requirements.
>
> Do you agree with that?

[6] This sentence makes more sense if "expected" is substituted for "inspected," but the parties give no indication whether "inspected" was some sort of error (*e.g.*, a misreading or mistranscription).

A. Yeah, I could probably somewhat agree with that statement, yes.

Q. You say somewhat agree with that statement. Do you have any hesitation, and if so, what is the—

A. The only hesitation would be the maintenance part of it, you know, we just never really got those leaks resolved. So they were really early-on, and just continued. So it was, you know, so I would probably disagree with the time frame that he may be referring to there, of failure.

Q. But you agree with him that the choice of fittings, and et cetera, that is referenced there, didn't necessarily cause the units not to be functional?

A. Yeah. We got them functioning . . . .

(ECF No. 72-12 at 9–10.)

Aston counters by highlighting the phrases "*somewhat* agree" and "didn't *necessarily* cause the units not to be functional." (ECF No. 78 at 6, ¶ 31 (emphasis added).) However, King clarified "somewhat agree" to mean that he believed UEM's expert underestimated just how quickly maintenance would be needed. King did not otherwise qualify his assent. Moreover, although in response to an arguably poorly phrased question, King's agreement that the fittings and hoses "didn't *necessarily* cause the units not to be functional" is not enough on its own to defeat summary judgment in light of King's testimony as a whole. Notably, Aston did not counter with evidence of its own—or even argument—that the fittings, hoses, and so forth could indeed have caused the units' failure.

Accordingly, UEM is entitled to summary judgment as to some aspect of these claims. The problem in formulating the appropriate scope of summary judgment is that

neither party has explained the full reasons for the Units' failure. The Court cannot say on this record that the immateriality of "the choice of fittings . . . used in the primary intake to the hydraulic pumps, and the choice of hose in the case drain lines" necessarily means that UEM contributed nothing to the Orica's inability to resell the Units to Oaky Creek. Nonetheless, to the extent Orica can prove lost profits or other consequential damages against Aston, and to the extent Aston can prove that those lost profits were reasonably foreseeable to UEM, UEM is entitled to summary judgment on any such damages attributable to "the choice of fittings . . . used in the primary intake to the hydraulic pumps, and the choice of hose in the case drain lines."

## IV. CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1. UEM's Motion for Summary Judgment (ECF No. 72) is GRANTED with respect to any consequential damages awarded to Orica on account of "the choice of fittings . . . used in the primary intake to the hydraulic pumps, and the choice of hose in the case drain lines" in Units 2–4, and otherwise DENIED; and

2. This matter REMAINS SET for a seven-day jury trial beginning on March 28, 2016, with a Final Trial Preparation Conference on March 4, 2016 at 2:00 p.m. in Courtroom A801.

Dated this 21st day of October, 2015.

BY THE COURT:

William J. Martínez
United States District Judge